TROJAN LAW OFFICES
R. JOSEPH TROJAN    Cal. Bar No. 137,067
9250 Wilshire Blvd., Suite 325
Beverly Hills, CA   90212
Telephone:    310-777-8399
Facsimile:    310-777-8348
Email:   Trojan@trojanlawoffices.com

Attorney for Defendant and Third-Party Plaintiff
JIM O'NEAL DISTRIBUTING, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ONE INDUSTRIES, LLC, a limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> JIM O'NEAL DISTRIBUTING, INC., a corporation, <br><br> Defendant. <br><br> AND ALL RELATED COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS. | Case No. 06cv1133 JAH(AJB) <br><br> **DECLARATION OF ANTONIO R. SARABIA II IN SUPPORT IN SUPPORT OF DEFENDANT AND THIRD-PARTY PLAINTIFF JIM O'NEAL DISTRIBUTING INC.'S OPPOSITION TO PLAINTIFF AND THIRD-PARTY DEFENDANTS MOTION FOR SUMMARY JUDGMENT** <br><br> The Honorable Anthony Battaglia <br> Complaint Filed:   May 25, 2006 |

I, Antonio R. Sarabia II, declare:

1.      I have been retained by the firm Trojan Law Offices, counsel for Defendant and Third-Party Plaintiff Jim O'Neal Distributing, Inc. to provide an expert opinion and report. This declaration contains facts which are personally known to me.  If called upon to testify to these facts under oath, I could and would testify to the facts competently and under oath.  It also contains statements based on information and belief and opinions.  I believe those statements to

be true and those opinions to be correct.

2. For more than twenty years I have worked in the apparel business as a business person and attorney. I have concentrated on apparel brand and design establishment and protection. I have a great depth of experience with the creation of original designs in the apparel business. I am a member of the State Bar of California and admitted to practice before this Court.

3. For nine years I was employed full time by a leading sportswear company, Guess?, Inc. During my employment at Guess, I constantly participated in and made management decisions about brand and design establishment and protection involving: (a) which designs and marks were original and protectable; (b) registration of copyrights and trademarks; and (c) the enforcement and expansion of rights to brands and designs. I worked closely and frequently with the design, advertising and financial departments. With each of these departments I was involved with policies, contracts and management decisions. I regularly saw how apparel and fabric designs were inspired, sourced and created. I coordinated with the advertising department to protect its creations. I was informed of new advertising campaigns as they were developed. I was familiar with the advertising budget and the means used to promote the brand. I was frequently in apparel factories so that I became familiar with the manufacturing of garments from the ordering of component parts, such as fabric and trim, through fabric cutting, garment assembly, final trim, packaging and shipping. After I left Guess, I continued to work in all of the areas outlined above with a variety of apparel industry clients.

4. Since 1984 I have specialized in the evaluation and development of copyright and trademark portfolios for companies. I create worldwide copyright and trademark plans for companies. I have managed copyright and trademark portfolios with thousands of copyrights and marks. I advise apparel companies on whether new designs for fabric prints, labels, tags and decorative stitching are sufficiently different from their sources of inspiration to be original. I have met with individual designers and conducted seminars for design departments on originality. I have worked closely with prominent apparel designers such as Georges Marciano.

5. I have reviewed the uses by O'Neal of its "O" logo over the years. The core element of this logo is that it resembles the letter "O." Like the letter "O" it is generally rounded. But, also like the letter "O," it might have an array of different appearances – some of which are not oval or rounded – and still suggest the same image. O'Neal has used different versions of the "O" mark overtime. It is common for trademarks and logos to evolve over time. Coke, McDonald's and the NBC television (the peacock) are just a few examples of companies with changing trademarks. While trademark and logos may evolve, core elements often remain. In the case of O'Neal Distributing, the core element is its resemblance to the letter "O."

6. The evolution of the "O" mark is important in this case because it educated motocross apparel consumers to associate a variety of "O" designs with O'Neal Distributing. Over time consumers and industry professionals came to associate the core element – resemblance to an "O" – with products made by O'Neal Distributing. This meant that when a motocross apparel consumer saw such a mark he or she associated it with gear made by O'Neal Distributing.

7. O'Neal Distributing has reached motocross consumers with its "O" logo by: (a) advertising for many years in leading motocross magazines such as <u>Dirt Bike</u> and <u>Motocross Action</u>, as well as in other magazines such as <u>Dirt Wheels</u>, <u>ATV Action</u> and <u>BMX Plus</u>; (b) sponsoring racers in nationally televised motocross and supercross races watched by hundreds of thousands of fans; (c) distribution of 25,000 catalogs a year for many years; (d) the use of retail point of sales advertisements; (e) its presence on its own and others' motocross related web sites; (f) participation in trade shows; and (g) national distribution of its products.

8. In 1998 there were about 1.2 million motocross motorcycles in the U.S. and about 850,000 readers of magazines in which O'Neal Distributing advertised its "O" trademark. Accordingly, about 70% of motocross consumers were exposed to the "O" trademark through advertising.

9. In 1998 retail sales of wearing apparel and helmets with the "O" and "O'Neal" trademarks were $16,321,486 and helmets alone were almost $4 million. Motocross gloves, boots, jersey, shoulder pads and riding belts sold under the "O" and "O'Neal" trademarks were all in the top 5 in consumer ownership.

10. By 1998 motocross apparel and helmets sold under the "O" and "O'Neal" trademarks had about 17.5% of the motocross apparel market. To put this market share in perspective, 17.5% is about the same as Ford's share of the U.S. car market in 2006.

11. By 1999, O'Neal Distributing, established a reputation among consumers for the trademark "O" on motocross clothing and helmets (excluding goggles) that has continued to the present, and as a result, motocross apparel consumers were likely to associate any "O" on motocross apparel, including helmets, with O'Neal Distributing.

12. From 1996 – 2006, retail sales of apparel and helmets with the "O" and "O'Neal" trademarks exceeded $250 million. By 2006, O'Neal had sold more than 375,000 helmets with its trademarks for total retail sales of $52 million. By 2006, O'Neal had spent more than $1,000,000 on advertising the "O" and "O'Neal" trademarks on helmets and about $4.7 million on advertising all motocross apparel. This shows that even after establishing its brand and reputation with consumers, it continued to take great lengths to maintain and strength the reputation it had gained. The substantial marketing and sales accomplishments of O'Neal with its trademarks "O" and "O'Neal" solidified the reputation of these trademarks with consumers in the motocross helmet and apparel markets.

13. My conclusions about the reputation and consumer recognition of the "O" logo on motocross wearing apparel are based upon the generally accepted standards of brand development in the sportswear business. I know these standards and that these standards are generally accepted in the apparel business as a result of my extensive work with the brands, trademarks and apparel companies over the last 20 years.

14. Mr. Blanchard and Mr. Boinard are the principals of One Industries. For a number of years One Industries' primary motocross business was decals and decorative kits. Mr.

Blanchard and Mr. Boinard sought to expand their product line into helmets. In 2003, when One Industries first began preparations to expand into the helmet market, Mr. Blanchard and Mr. Boinnard both knew of O'Neal Distributing's long term reputation and use of the "O" mark. As motocross participants themselves, Mr. Blanchard and Mr. Boinard had only to watch what fellow participants were wearing and listen to what they were saying to learn of the consumer reputation of O'Neal Distributing helmets in 2003. As motocross industry participants, Mr. Blanchard and Mr. Boinnard would be expected to have a far greater knowledge of motocross brands than the average consumer.

15. By January 2004, when One Industries entered the helmet market, O'Neal Distributing already had a major market share with its "O" trademark. Because of O'Neal Distributing's marketing, market share, sales and use of variations of an "O," consumers and industry professionals associated any "O" on motocross apparel and helmets (excluding goggles) with O'Neal Distributing. An "O" mark used by any other company on motocross apparel and helmets would be confused with the strong and established O'Neal Distributing "O" mark.

16. Mr. Blanchard and Mr. Boinard knew of O'Neal Distributing's "O" logo helmet reputation and chose to use an "O" because it was similar to one of the most prominent helmet lines in the motocross business. The One Icon mark looks like an "O" – although it does not have a rounded oval shape - and is likely to be perceived by consumers as the O'Neal "O" logo.

17. One Industries chose to distance its helmet line from its primary One Industries brand by keeping the words "One Industries" off the helmet, and instead using their new "O" logo.

1  In addition, they kept the helmet line off the One Industries website and launched a new website
2  for the helmets that did not feature the words "One Industries."

18.    For a number of reasons, it is likely that One Industries intended to take advantage of the reputation of the O'Neal Distributing Brand "O" mark by entering the motocross helmet market with an "O" logo. First, the principals knew of O'Neal Distributing's "O" trademark and the successful and reputable helmet line which featured that trademark. Second, One Industries carried out a plan to launch a new helmet line under the "O" mark. Third, the new helmet line was distanced from One Industries.

19.    My conclusions about the development of the One Industries "O" helmet line are based upon the generally accepted standards about trademark infringers in the sportswear business. I know these standards and that these standards are generally accepted about trademark infringers in the sportswear business as a result of my extensive work with infringers, trademarks and apparel and sportswear companies over the last 20 years.

20.    The confusion has been so substantial that it has permeated industry veterans, including the owners of motocross retailers and the owner of prominent motocross magazines, as well as retailers and consumers. Motocross retailers testified that they experienced consumer confusion between the O'Neal Distributing and One Industries "O" marks.

21.    When consumers and industry veterans confuse the "O" trademark of a relatively new market entrant, like One Industries, with the more established "O" trademark of O'Neal

Distributing, the new company gets the benefit of the reputation of the older company. O'Neal Distributing's trademark "O" is associated with desirable products. This is reflected in the consistently high rankings of O'Neal Distributing's products in consumer surveys which I reviewed. A new helmet line has no established reputation. Consumers do not know if the new helmet line is durable, they do not know whether the company manufacturing the line will make repairs and process returns. It takes years to build a good brand reputation among consumers. Once a good reputation is built, the company earning the reputation will benefit from the good reputation with increased sales. If a new company free rides on an established company by copying its mark, it should enjoy quicker success. If a new company uses a mark which confuses consumers into thinking it is the established company, it will get the benefit of that good reputation - and increased sales - without having to earn it.

22. The use of the "O" mark by One Industries has led to both consumer and industry veteran confusion and has had adverse effects upon O'Neal Distributing.

23. My conclusions about the confusion between "O" brands and the adverse effects of the confusion on O'Neal Distributing are based upon the generally accepted standards about brand confusion in the sportswear business. I know these standards and that these standards are generally accepted in the apparel business as a result of my extensive work with the brands, trademarks and apparel companies over the last 20 years.

24. To summarize, in 2003 Mr. Boinard and Mr. Blanchard knew O'Neal Distributing's "O" mark motocross helmet was widely recognized by consumers. They

06 CV 1133 JAH (AJB)

8

intentionally selected an "O" mark for their new helmet line which launched in 2004. Mr. Boinard and Mr. Blanchard separated the new helmet line from their existing business to maximize consumer confusion. Confusion between One Industries' "O" helmets and O'Neal Distributing's "O" helmets occurred. This confusion resulted in lost sales for O'Neal Distributing and substantial business growth for One Industries.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 27, 2007 at Rolling Hills Estates, California.

_____

Antonio R. Sarabia II