```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   ONE INDUSTRIES, LLC,          )
     A limited liability company, ) CASE NO.
 5                                 ) 06 CV 1133 JAH(AJB)
            Plaintiffs,            )
 6                                 )
         vs.                       )
 7                                 )
     JIM O'NEAL DISTRIBUTING, INC.,)
 8   A corporation,                )
                                   )
 9          Defendants.            )
     _____)
10                                 )
     JIM O'NEAL DISTRIBUTING, INC.,)
11                                 )
            Counterclaimants,      )
12                                 )
         vs.                       )
13                                 )
     ONE INDUSTRIES, LLC,          )
14                                 )
            Counterdefendants.     )
15   _____)
16
17
18       DEPOSITION OF FRANK KASHARE taken on
19       behalf of the plaintiffs/counterdefendants
20       at 9250 Wilshire Boulevard, Suite 325,
21       Beverly Hills, California, beginning at
22       10:12 A.M., and ending at 5:58 P.M., on
23       Thursday, April 19, 2007, before
24       Lena Mescall, Certified Shorthand Reporter
25       No. 13018.
                        Page 2
```

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS/COUNTERDEFENDANTS:
 4      X-PATENTS, APC
 5      BY: JONATHAN HANGARTNER, ESQ.
 6      5670 La Jolla Boulevard
 7      La Jolla, California 92037
 8      (858) 454-4313
 9      jon@x-patents.com
10
     FOR THE DEFENDANTS/COUNTERCLAIMANTS:
11
        TROJAN LAW OFFICES
12
        BY: R. JOSEPH TROJAN, ESQ.
13
        9250 Wilshire Boulevard, Suite 325
14
        Beverly Hills, California 90212
15
        (310) 777-8399
16
        trojan@trojanlawoffices.com
17
18   ALSO PRESENT: Marc Blanchard
                   Ludovic Boinnard
19
20
21
22
23
24
25
                        Page 3
```

```
 1                    INDEX
 2
 3   WITNESS                              PAGE
 4   Frank Kashare
 5
 6      Examination by Mr. Hangartner       7
 7
 8
 9
                       EXHIBITS
10
11   MARKED      DESCRIPTION               PAGE
12   1    Letter dated May 11, 2006         45
13   2    Answer and counterclaims from O'Neal  51
14   3    One-page drawing                  58
15   4    One-page drawing                  58
16   5    E-mail dated August 8, 2006      117
17   6    Printout from Dennis Kirk, 3 pages  128
18   7    Printout from Dennis Kirk, 1 page  133
19   8    Printout from Dennis Kirk, 1 page  135
20   9    Printout from MS-Zone.com, 1 page  139
21   10   E-mail dated March 13, 2007,
          at 4:01 P.M.                     161
22
     11   E-mail dated March 13, 2007,
23        at 4:27 P.M.                     163
24   12   E-mail dated March 13, 2007,
          at 4:57 P.M.                     165
25
                        Page 4
```

```
 1   13   One-page advertisement           182
 2   14   Registration documents, 5 pages  183
 3   15   Registration documents, 1 page,
          ONEAL 0009338                    185
 4
     16   Registration documents, 1 page,
 5        ONEAL 0009344                    186
 6   17   O'Neal advertisement, 1 page     258
 7   18   O'Neal catalog, 2005             267
 8   19   O'Neal catalog, 2006             270
 9   20   O'Neal catalog, 2004             273
10   21   One catalog, 2007                277
11   22   One catalog, 2006-2007           281
12   23   Advertisement                    284
13   24   Catalog                          288
14   25   One catalog, 2005-2006           289
15   26   Catalog                          291
16   27   Catalog                          291
17   28   Transworld Motocross Survey Results  295
18
19   Confidential Transcript: Pages 197 through 256
20
21
22
23
24
25
                        Page 5
```

```
 1    Q.  Okay. So now after the helmet incident, when
 2  was the next time that you are aware of any alleged
 3  confusion?
 4    A.  I wouldn't be able to tell you in chronological
 5  order.
 6    Q.  I'm asking -- not yet for chronologic --
 7  well --
 8    A.  You said next time. So --
 9    Q.  You're right. I did ask the next time. So --
10       MR. TROJAN: Mind if we take a break.
11       MR. HANGARTNER: Yeah. That's fine.
12  Absolutely. Let's do that.
13       THE VIDEOGRAPHER: We are off the record at
14  11:38 A.M.
15       (A break was taken.)
16       THE VIDEOGRAPHER: We are back on the record at
17  11:52 A.M.
18  BY MR. HANGARTNER:
19    Q.  So right before we broke I was trying to ask
20  the question about the next instance of alleged
21  confusion that you are aware of.
22    A.  Yes, sir.
23    Q.  So you described the helmet situation where you
24  sent back the helmet to -- to someone. After that, when
25  is the next instance of confusion that you are aware of?
```
Page 82

```
 1    A.  When you say "next," are you referring to the
 2  chronological order of incidences as they occurred, or
 3  do you just want to know other instances?
 4    Q.  I was asking chronologically, but if that's too
 5  hard, we can try it the other way.
 6    A.  I'm afraid I just don't have a chronological
 7  time line in front of me.
 8    Q.  Okay.
 9    A.  So the best of my recollection was we were
10  getting some phone calls about people asking for O'Neal
11  blank helmet. That blank would be the model helmet
12  which One Industries makes. What comes to mind is
13  Kombat, but I don't know that there was never another
14  called. We certainly had calls for Monster helmets and
15  Rockstar helmets. Monster helmet's something that we
16  were just coming out with, but before we had it out, we
17  had calls for that too, and Rockstar helmet.
18       We also found instances of confusion on the
19  Internet, consumer Web sites that are ran by large mail
20  order companies in which they'd listed One Industries
21  helmets in categories under O'Neal.
22    Q.  Okay. Let's try to deal with the -- the
23  telephone calls that you just described.
24    A.  Yes, sir.
25    Q.  Okay. So if I heard you right, you said you
```
Page 83

```
 1  had calls from people asking for an O'Neal-something,
 2  but giving the name of a One product; is that correct?
 3    A.  Yes. And when I say I had calls, I mean the
 4  guys that answer the phones.
 5    Q.  Okay. Have you ever had a call like that?
 6  Personally?
 7    A.  I don't take calls from dealers.
 8    Q.  But has -- has anyone ever asked you for an
 9  O'Neal Kombat or an O'Neal-whatever that was not your
10  product?
11    A.  Well, I don't deal with people that are asking
12  for products. So, no, other than the instance that I
13  have described to you earlier when someone had sent back
14  the incorrect product.
15    Q.  Okay. So everything you know about these calls
16  is based on something someone else told you; is that
17  correct?
18    A.  No.
19    Q.  Okay. So explain why not?
20    A.  There has been a couple of calls where I've
21  asked more specific about the confusion. Therefore, it
22  wasn't exactly what someone told me but may have been a
23  result of question and answer.
24    Q.  Question and answer with who?
25    A.  Salesmen.
```
Page 84

```
 1    Q.  With the person who took the call?
 2    A.  Yeah.
 3    Q.  Okay. So not a question and answer with the
 4  person who called?
 5    A.  No. I generally don't take those calls, as I
 6  said.
 7    Q.  So let's -- but even in those instances, you
 8  don't have firsthand knowledge of why the person was
 9  confused. You're being told that information by your
10  salesperson; is that accurate?
11    A.  Well, to me the firsthand knowledge came from
12  the only person that I would talk to. That's firsthand
13  for me. Firsthand for them is the person they spoke to,
14  if I understand the definition of firsthand. Firsthand
15  knowledge would be the person who took the call.
16    Q.  Okay. But you learned -- all your information
17  is coming from the salesperson; correct?
18    A.  You mean information pertaining to the phone
19  calls --
20    Q.  Yes.
21    A.  -- in particular?
22    Q.  Yes.
23    A.  Generally, I'd say yes.
24    Q.  Okay. Any instance where that's not true?
25    A.  I believe I have followed up on some of the
```
Page 85

21 (Pages 82 to 85)

**Page 86**

1 calls, but the first time we heard of it would have been
2 the call coming in to somebody else.
3  Q. Now, when you say you followed up on some of
4 the calls, what specifically did you do to follow up?
5  A. Well, for example, the other day I believe
6 Justin had mentioned a call from Cycle Parts West.
7  I called Cycle Parts West, and I asked
8 John Gregory, "Did this guy call, asking for an O'Neal
9 Rockstar helmet?"
10  Q. Who is John Gregory?
11  A. He's an employee of Cycle Parts West.
12  Q. Okay. And what's his position at Cycle Parts
13 West?
14  A. I don't know. He's kind of the right-hand man.
15 I don't know what his title is.
16  Q. But is he your kind of direct counterpart at
17 Cycle Parts West?
18  A. When I deal with Cycle Parts West, I would say
19 I deal with the owner, but I have dealt with John.
20  Q. Who is the owner?
21  A. Rocky Travino.
22  Q. And -- and so why did you call John?
23  A. I just happened to have heard from this guy
24 that had happened -- John seems to be the more hands-on
25 guy at the store level, I guess, and so I picked up the

**Page 87**

1 phone and said, "John, we just got a call from your guy
2 in the store with a consumer in front of him asking for
3 an O'Neal Rockstar helmet. Did this happen?"
4  Because of this litigation, I felt I should
5 make the call and document it.
6  Q. What did he say?
7  A. "Yes."
8  Q. Okay. Let's walk through your call in its
9 entirety.
10  A. Okay. I'll do my best.
11  Q. What time was this call made?
12  A. I don't know.
13  Q. What day was it?
14  A. Within the last seven business days.
15  Q. And who was the salesperson who alerted you to
16 this at your company?
17  A. Riley. I don't know his last name. Riley is
18 his first name, I believe.
19  Q. Is that the fellow mentioned yesterday --
20  A. Yes.
21  Q. Riley Birmingham or something?
22  A. (No audible response.)
23  Q. Okay. So what exactly did Riley say to you
24 about the phone call?
25  A. "I just received another call from a dealer

**Page 88**

1 looking for an O'Neal Rockstar helmet."
2  Q. Anything else?
3  A. Not that I recall.
4  Q. Who did he say the call came from?
5  A. I asked him who the call came from, and he
6 said, "Hold on," walked back and asked the guy his name
7 and the name of the store.
8  Q. So the guy was actually on the phone still?
9  A. That's my understanding because he did tell me
10 to hold on for one second, and I can't remember the
11 individual's name, Tony or Tommy from Cycle Parts West.
12  Q. Okay. And did you know at the time if the guy
13 was still on the phone?
14  A. No.
15  Q. What did you think Riley had done when he went
16 back to his desk?
17  A. I assume he asked him his name and his store
18 location. I don't know.
19  Q. But you knew at the time when Riley went back
20 to his desk that --
21  A. Well, I had asked him a specific question.
22 "Who's on the phone," you know, "where is this coming
23 from," because he just told me he got another call.
24  Q. But were you aware that that phone call was
25 still ongoing?

**Page 89**

1  A. No. I don't believe that I was.
2  Q. Okay. So he told you -- Riley came back to you
3 with a name?
4  A. Yes, sir.
5  Q. Okay. And best recollection of that name is
6 what?
7  A. I think it was Tony or -- Tony or Tommy.
8  Q. Okay. And what else did he tell you about the
9 call?
10  A. From Cycle Parts West.
11  Q. Anything else?
12  A. He's asking for -- well, I told you that at the
13 beginning so -- I don't recall any other details now.
14  Q. Now, did you write anything down about that,
15 take any notes, anything?
16  A. I believe I immediately did write a note or
17 something to you or to -- to counsel.
18  Q. Okay. Other than a note to counsel, did you do
19 anything to make a record of this call?
20  A. No. I think that was it.
21  Q. Now, when did you -- did you do anything else
22 to follow up on this situation at the time?
23  A. Yes, sir.
24  Q. What did you do?
25  A. I called Mr. Gregory.

22 (Pages 86 to 89)

FRANK KASHARE

Exhibit KK
79

| | |
|---|---|
| 1   Q. And when did you call Mr. Gregory? | 1   you the complete name of the employee who made this |
| 2   A. Within a short period of time after the call. | 2   phone call; correct? |
| 3   Q. Same day? | 3   A. If Gordon is Riley's last name -- |
| 4   A. I believe so. | 4   Q. No. No. I'm talking about -- I'm sorry |
| 5   Q. Okay. Now, what was -- walk me through your | 5   Mr. Gregory, not Mr. Gordon. |
| 6   conversation with Mr. Gregory. | 6   A. Okay. |
| 7   A. Well, Mr. Gregory is aware of the litigation, | 7   Q. I'm sorry. I am confusing you here. |
| 8   and I believe I said to him, "John, did you just have a | 8   A. Yes, sir. |
| 9   guy call here looking for an O'Neal Rockstar helmet," | 9   Q. Okay. When you spoke to Mr. Gregory -- |
| 10   and he said, "Hold on. I'll find out." | 10   A. Yes, sir. |
| 11   And he said, "Yes, I did." | 11   Q. -- at Cycle Parts West -- |
| 12   Q. Okay. When you say Mr. Gregory is aware of the | 12   A. Yes, sir. |
| 13   litigation, how do you know that? | 13   Q. -- did he give you the name of the employee who |
| 14   A. It's been mentioned to them before, but I don't | 14   was involved in this call with Riley? |
| 15   remember the context of the conversation. | 15   A. Yes, sir. |
| 16   Q. Who mentioned it to them? | 16   Q. And did you write that down? |
| 17   A. I don't know if Ludo did or -- or what. | 17   A. Yes, sir. |
| 18   Q. How do you -- I am asking you a question, how | 18   Q. Did you keep a record of that somewhere that we |
| 19   do you know that Mr. Gregory is aware of this | 19   could -- |
| 20   litigation? | 20   A. Yes, sir. I e-mailed it to my attorney. |
| 21   A. It's been mentioned before in my conversation | 21   Q. Okay. Other than in an e-mail to your |
| 22   with Mr. Gregory present. I did not notify them of the | 22   attorney, did you write it down anywhere? |
| 23   litigation initially, I don't believe. | 23   A. No. I believe I typed it immediately. |
| 24   Q. Okay. And did you raise the topic of the | 24   Q. Okay. And what else did he tell you about what |
| 25   litigation with Mr. Gregory? | 25   had happened? |
| Page 90 | Page 92 |
| 1   A. I don't recall. | 1   A. I don't believe he told me anything else about |
| 2   Q. Okay. What was the substance of your | 2   it. |
| 3   conversation about the litigation? | 3   Q. Did you ask him why this guy would ask for a |
| 4   A. I don't recall. | 4   O'Neal Rockstar helmet? |
| 5   Q. You don't remember anything about it? | 5   A. No. I don't believe I did. |
| 6   A. Truly I don't recall. It would have taken | 6   Q. Did you ask him anything else? |
| 7   place quite some time ago. | 7   A. Well, to be honest, the reason was obvious to |
| 8   Q. So now you said Mr. Gregory said, "Hold on." | 8   us because we've calls of confusion. So I didn't ask |
| 9   Did he leave you on the line and go do | 9   him why or what the consumer wanted, nor was I going to |
| 10   something? | 10   direct him in any way, shape, or form. |
| 11   A. I believe he either put me on hold or called me | 11   Q. Now, let me ask you this: This person who made |
| 12   right back, but he informed me rather quickly that, yes, | 12   the call to Riley -- was that a customer -- and in that |
| 13   this took place and, yes, that was the guy's name, and | 13   sense, I mean an end user, or was it an employee of |
| 14   he also confirmed the name of the individual that was | 14   Cycle Parts West -- |
| 15   spoken to. | 15   A. It was an employee of Cycle Parts West, and my |
| 16   Q. Okay. And what was the name of the person at | 16   understanding was he had a customer in front of him |
| 17   Cycle Parts West? | 17   requesting this particular item. |
| 18   A. I told you before, Tony or Tommy. | 18   Q. Okay. And what is that understanding based on? |
| 19   Q. But -- so you don't remember anything more than | 19   A. My later conversations with Riley. |
| 20   that at this point? | 20   Q. Okay. Let's walk through those later |
| 21   A. No. I remember that they called, and they | 21   conversations with Riley. |
| 22   spoke with Riley, and they asked for the O'Neal Rockstar | 22   What else did Mr. -- what else did Riley tell |
| 23   helmet, and it was Cycle Parts West. | 23   you about this incident? |
| 24   Q. No. No. No. I'm sorry. I am asking you | 24   A. That a shop was calling and that he had a |
| 25   about -- you spoke to Mr. Gordon, and Mr. Gordon gave | 25   customer there and he was looking for an O'Neal Rockstar |
| Page 91 | Page 93 |

23 (Pages 90 to 93)

FRANK KASHARE

Exhibit KK
80

helmet. Struck me as continued confusion because a consumer was confused, and the guy working at the store was confused, and I have never talked to -- whatever the name that is begins with a "T," Tony or Tommy, nor am I aware of the fact that he's the regular ordering party of Cycle Parts West, but obviously he was concerned enough to try and help his customer immediately by calling and requesting a product.

Q. Now, what's a Rockstar helmet? What does that mean?

A. To me, it's a particular model of helmet that One Industries makes with a graphic on it that says the word "Rockstar."

Q. Okay. What -- is Rockstar just a logo? Is it some other --

A. It's an energy drink.

Q. It's an energy drink? Okay. So Rockstar is actually the name of a product; is that correct?

A. I don't know the specific product name that it would be referred to in the One catalog. However, I think that many people would refer to that helmet as a Rockstar helmet.

Q. And why would they refer to it as the Rockstar helmet?

A. Because in large font it has a Rockstar graphic

Page 94

or logo on it.

Q. Okay. And have you -- you've seen this helmet before?

A. I've seen a picture of it, yeah.

Q. Okay. Do you still have the picture of that helmet?

A. Pardon me?

Q. Do you have a picture of a Rockstar helmet?

A. If I've seen a picture, it's been in a magazine, and we probably -- we save all the magazines; so I'm sure we have it somewhere.

Q. Was it -- is it a product that was recently introduced, or has it been around for a while?

A. I don't know the date of introduction.

Q. Do you have any sense if it's been around for years? Is it something in the last year?

A. I am not entirely sure.

Q. I am asking for your best --

A. I couldn't give you an accurate guess. It could be as recent as six months. It could be three months. It could be a year and a half. I'm not exactly sure.

Q. Is there any other information that you have at this point about that incident?

A. No, sir.

Page 95

Q. You mentioned Rocky Travino. Is that the right name?

A. Yes, sir.

Q. Okay. Who is Rocky Travino?

A. My understanding is he's the owner of Cycle Parts West.

Q. Okay. Are you aware that O'Neal has subpoenaed Mr. Travino for a deposition in this case?

A. Yes, sir.

Q. And why is Mr. Travino being subpoenaed?

A. I can only assume it's based on my e-mail to counsel.

Q. Okay. Were you involved in the decision to subpoena Mr. Travino?

A. If it was recommended by counsel, then I'm sure they mentioned it before subpoenaing him.

Q. Have you ever talked to Mr. Travino about this incident?

A. No. I don't know if I've talked to Rocky about this particular incident.

Q. Have you talked to anyone else at Cycle Parts West about the incident?

A. Mr. Gregory, who I mentioned to you before.

Q. Other than Mr. Gregory?

A. I don't believe so.

Page 96

Q. Okay. And you gave counsel -- well, you have written down the name of the actual employee at Cycle Parts West who had the phone call with Riley, but you just don't remember the name, other than Tony or Tommy?

A. They only gave a first name.

Q. They only gave a first name. Okay.

A. And when I referred to Mr. Gregory under that first name, he did confirm that that person had made that call to us. And I generally don't write notes. I type them. It's just quicker that way.

Q. Okay. Now, can you explain to me why a customer asking for an O'Neal Rockstar helmet means the person's confused between One Industries and O'Neal?

A. We don't make a Rockstar helmet. One Industries does.

Q. Does anyone else make a Rockstar helmet?

A. Not that I am aware of.

Q. Okay. And did that customer say anything else about the helmet other than Rockstar helmet?

A. I didn't speak directly with the customer ever.

Q. Okay. Have you ever had anyone else ask for an O'Neal or are you -- strike that.

Are you aware of anyone else ever asking for an O'Neal Rockstar helmet?

A. I am aware that we've had calls, yes.

Page 97

24 (Pages 94 to 97)

FRANK KASHARE

Exhibit KK
81

## Page 114

1  Q. Okay. And are you referring to an actual call
2  to Ludo?
3  A. Yeah, I made calls to Ludo.
4  Q. Okay. Well, other than making a call to Ludo,
5  did you do anything -- have you ever done anything to
6  investigate, try to figure out why people are asking for
7  the One Kombat helmet -- O'Neal Kombat helmet?
8  A. To us it's been obvious. They are confused.
9  Q. But my question is did you do anything to
10  investigate why this happened?
11  A. Other than, as I explained, to try and resolve
12  the matter and/or look at the obvious, which, to us,
13  it's obvious that there's some confusion because we're
14  receiving these calls and requests, and vendors or
15  whomever is confused. No. I don't understand what
16  investigation would be necessary.
17  Q. Well, why -- specifically why do you think
18  people are calling and asking for a One Kombat helmet?
19  A. Because they are confused.
20  Q. But again -- and I misspoke -- for an O'Neal
21  Kombat helmet. But when you say they are confused, why
22  are they confused about that?
23  A. One would think they're confusing the brands.
24  Q. I am asking you what you think?
25  A. I think they are confusing the brands.

## Page 115

1  Q. And is there something particular about the One
2  Kombat helmet that you think is sparking that?
3  A. The logo? I don't know.
4  Q. I am asking you what -- you said it's obvious,
5  and I want to understand why it's obvious to you?
6  A. Well, to me, as you get these calls, you know,
7  you start to put the pieces together. Hey, it's O-n-e,
8  and we're O-N-e-a-l. It's got an "O" similar shape. We
9  have an "O" similar shape. There must be some
10  confusion.
11     We don't get calls for Thor product or Answer
12  product or MSR or Fox. All of a sudden we're getting an
13  abundance of inquiries, mistakes from vendors, mistakes
14  from consumers, and mistakes from dealers in regards to
15  one specific brand.
16     Maybe it's because the Kombat helmet is
17  popular, maybe because it's attractive, maybe because
18  it's new -- I don't know. But it certainly seemed to
19  increase dramatically with the introduction of that
20  particular product.
21  Q. And when was that particular product
22  introduced?
23  A. I don't know, but about the same time when we
24  started getting Kombat calls, I would assume.
25  Q. And that's -- you said, was about a year ago?

## Page 116

1  A. Best of my recollection.
2  Q. Spring of '06?
3  A. Best -- it could have been six months prior or
4  shortly thereafter but certainly before the Roon call,
5  yes.
6  Q. Your best memory of it, I think you said, was a
7  few months before the Roon call?
8  A. I would guess about a year ago, but I mean, it
9  would be unfair for me to try and put a particular day,
10  week, or month on it, but in that period of time. It
11  wasn't five years ago, and it wasn't five months ago.
12  It was about that period of time.
13  Q. You don't have any records or anything else
14  that might refresh your memory about when you first
15  started having this happen?
16  A. The exact day, no.
17  Q. Even narrow it down?
18  A. Not to the exact date, I don't think so.
19  Q. I am not asking for exact day again. I am
20  asking for the -- you know, as best we can -- that would
21  help us narrow it down. Is there anything you could
22  look at --
23  A. I've truly done the best I can to try and give
24  you a roundabout item, which I've said was a few months
25  prior to that of Roon, maybe about a year ago.

## Page 117

1  Q. Okay. Now, did you actually speak to Rob Roon
2  at all about the call that he received?
3  A. No. I don't think I did.
4  Q. How did you hear about it?
5  A. Justin told me.
6  Q. Okay. Any other way that you heard about it?
7  A. I got the e-mail.
8  Q. Okay. What specifically did Justin tell you
9  had happened?
10  A. It was nearly a year ago. I don't recall the
11  specific words, but that I guess Rob had had confusion
12  or experienced confusion with One product and O'Neal
13  product, and he was sending a letter or had sent one
14  that -- that describes it.
15     MR. HANGARTNER: I'll ask you to mark this as
16  Exhibit 5.
17     (Exhibit 5 was marked for
18     identification by the reporter.)
19  BY MR. HANGARTNER:
20  Q. So she's placed in front of you what's marked
21  as Exhibit 5. Have you seen that document before?
22  A. Yes, sir. It appears to be the same letter
23  that I received a copy of.
24  Q. So this is the e-mail that you were referring
25  to a minute ago?

FRANK KASHARE

Exhibit KK
82